

JMG: USAO2018R00558

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICTOF MARYLAND
(Northern Division)**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIM. NO. $\underline{RDB\text{-}19\text{-}0265}$ |
| | ) | |
| v. | ) | (False Claims, 18 U.S.C. § 287; |
| | ) | Causing an Act to Be Done, |
| KYLE DURAN SMEGO, | ) | 18 U.S.C. § 2(b)) |
| | ) | |
| *Defendant.* | ) | |
| _____ | ) | |

ENTERED ____
FILED ____ RECEIVED
LODGED ____
MAY 29 2019
AT BALTIMORE COURT
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND   DEPUTY
BY

**INFORMATION**

The United States Attorney for the District of Maryland charges that, at all times relevant to this Information:

1.     The National Security Agency (NSA) was a component of the United States Department of Defense, which was part of the executive branch of the United States government.

2.     During the period from February 2016 to present, the NSA had ongoing contracts identified as H98230-13-D-0162 (DO 001) (known as the CTS contract) and H98230-17-C-0134 (known as the ROADRALLY contract) with an outside company (Contractor A). Each of these contracts required Contractor A to provide it with information technology (IT) services, which included providing software engineers and developers to work onsite at various NSA or Contractor A locations.

3.     Contractor A in turn contracted with Subcontractor 1 to provide it with software engineers and developers in connection with the CTS contract, and it likewise contracted with Subcontractor 2 to provide it with software engineers and developers needed in connection with the ROADRALLY contract.

4.      Defendant **KYLE DURAN SMEGO** was a resident of Linthicum Heights, Maryland.  From in or about February 2016 through in or about May 2018, **SMEGO** was successively employed on a full-time basis by Subcontractors 1 and 2 to work on the CTS and ROADRALLY contracts held by Contractor A as a software engineer/front end developer.  **SMEGO's** duty stations with respect to the CTS contract were variously at locations known as NBP1, FANX3, and the R&E (Research & Engineering) Building at the NSA's facility at Fort Meade, Maryland, and at NBP 410, a Contractor A facility. **SMEGO's** duty stations with respect to the ROADRALLY contract were initially at the R&E Building and then at OPS1 at the NSA's facility at Fort Meade, Maryland.

5.      Because the subject matter of both of these contracts involved classified information, all of the work performed on these contracts had to be at secure, access-controlled locations.  Under the NSA's contract with Contractor A and his contracts with Subcontractors 1 and 2, **SMEGO** was therefore required to be physically present at his assigned duty locations to perform his responsibilities on the CTS and ROADRALLY contracts.

6.      Subcontractors 1 and 2 each required **SMEGO** to submit timesheets in electronic form.  Those timesheets required **SMEGO** to provide date- and task-specific entries setting forth the number of hours he had worked on the CTS and ROADRALLY contracts and supplying the technical task order (TTO) of the work he had performed or any applicable leave category (e.g., vacation, sick, or holiday).  Subcontractors 1 and 2 then submitted **SMEGO's** reported hours on a weekly basis to Contractor A and billed Contractor A for the services provided by **SMEGO** and other personnel they had hired. Subcontractor 1 billed Contractor A for **SMEGO's** services at loaded labor rates ranging

from $112.26 to $128.78 an hour, while Subcontractor 2 billed Contractor A for **SMEGO** at a loaded labor rate of $159.08 an hour.

7.      Based upon those invoices submitted by Subcontractors 1 and 2, Contractor A then presented monthly invoices to the NSA for the hours that **SMEGO** claimed to have worked, typically adding a small mark-up to the labor rate each subcontractor had billed for **SMEGO**.  NSA then paid Contractor A for **SMEGO's** time based upon the labor rates it submitted; Contractor 1 in turn paid Subcontractors 1 and 2 based upon the rates they had submitted for **SMEGO's** time; and Subcontractors 1 and 2 in turn paid **SMEGO** based upon his agreed hourly rate for the hours he had reported.

8.      Between February 2016 and November 2017, **SMEGO** reported to Subcontractor 1 that he had worked 3,289 hours on the CTS contract.  Between November 2017 and May 2018, **SMEGO** reported to Subcontractor 2 that he had worked 797.5 hours on the ROADRALLY contract.

9.      A subsequent review by the NSA of access control (key card) and timecard information demonstrated that **SMEGO** was not actually present at his assigned duty stations for 1,326 of the 3,289 hours he had reported to Subcontractor 1 (40.3%) and 375 of the 797.5 hours he had reported to Subcontractor 2 (47%).  All of these hours that were falsely reported by **SMEGO** were subsequently billed by the subcontractors to Contractor A, and in turn were billed by Contractor A in turn to the NSA.  The timesheets that **SMEGO** submitted to Subcontractors 1 and 2 included entries for 119 separate days in which **SMEGO** represented that he had worked an average of 8 hours (94 days for Subcontractor A and 25 days for Subcontractor B) when, in fact, he had not accessed his assigned work locations and had not worked at all on those days.

3

10.     Based upon the false and fictitious billing records submitted by **SMEGO** to Subcontractors 1 and 2, which they in turn submitted to Contractor A and which it then submitted to the NSA, the NSA in turn overpaid Contractor A by $160,724.42, more or less, for fictitious hours reported by **SMEGO** on the CTS contract and $59,655.00, more or less, for fictitious hours that he reported on the ROADRALLY contract, for a total combined overpayment of approximately $220,379.42. Subcontractors 1 and 2 then respectively paid **SMEGO** $85,275 and $29,835 for work he had not actually performed on these contracts – a total of $115,110.

## The Charge

11.     On or about July 31, 2017, in the State and District of Maryland, the defendant,

### KYLE DURAN SMEGO,

caused Contractor A to submit a false, fictitious and fraudulent claim upon and against the NSA, an agency of the United States, that is, an invoice that represented that for the period between July 1 and July 30, 2017, defendant **SMEGO** had worked 99.75 hours at the FANX3 facility of the NSA on the CTS contract, whereas, in truth and in fact, defendant **SMEGO** actually worked only 23.25 hours, more or less, at the FANX3 facility during that period, and defendant **SMEGO** had knowingly submitted a false, fictitious and fraudulent timesheet/time record to Subcontractor 1 representing that he had worked 99.75 hours in that time period, knowing that Subcontractor 1 would in turn submit an invoice or request for payment based on his false and fictitious timesheets to

Contractor A and that it, in turn, would submit invoices containing this false and

fictitious information to the NSA for payment.


18 U.S.C. § 287
18 U.S.C. § 2(b)


_May 28, 2019_
Date

_Robert K. Hur (AMB)_
ROBERT K. HUR
UNITED STATES ATTORNEY

5