Original ✓



**U.S. Department of Justice**

*United States Attorney*

*District of Maryland*

| | | |
|---|---|---|
| *Jefferson M. Gray* | *Suite 400* | DIRECT: 410-209-4915 |
| *Assistant United States Attorney* | *36 S. Charles Street* | MAIN: 410-209-4800 |
| *Jefferson.M.Gray@usdoj.gov* | *Baltimore, MD 21201-3119* | FAX: 410-962-3091 |

April 16, 2019

Ms. Katharine T. Newberger
Assistant Federal Public Defender
Office of the Federal Public Defender
   for the District of Maryland
100 S. Charles Street, Tower II, Ninth Floor
Baltimore, Maryland 21201

          Re: *United States v. Kyle Duran Smego*
          Crim. No. ~~TBD~~ RDB-19-0265

Dear Counsel:

      This letter, together with the Sealed Supplement, confirms the plea agreement (this "Agreement") that has been offered to your client, Kyle Duran Smego (hereinafter "Defendant"), by the United States Attorney's Office for the District of Maryland ("this Office"). If the Defendant accepts this offer, please have the Defendant execute it in the spaces provided below. If this offer has not been accepted by Friday, May 24th, it will be deemed withdrawn, and we will proceed with presenting his case to the Grand Jury for possible indictment. The terms of the Agreement are as follows:

### Offense of Conviction

     1.    The Defendant agrees to plead guilty to Count One of an Information that will be filed by this Office, which charges the Defendant with submitting false claims to the United States in violation of 18 U.S.C. §§ 287 and 2(b). The Defendant admits that he is, in fact, guilty of that offense and will so advise the Court at the time of his rearraignment.

### Elements of the Offense

     2.    The elements of the offense to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows:

- First, that the Defendant caused to be presented to the National Security Agency (NSA) a claim against the United States;

1

- Second, that at the time this claim was presented, the NSA was a department or agency of the United States;

- Third, the claim presented was false, fictitious, and fraudulent in that it represented that for the period between July 1 and July 30, 2017, defendant Smego had worked 99.75 hours at the FANX3 facility of the NSA on the CTS contract, whereas defendant Smego actually worked only 23.25 hours, more or less, at the FANX3 facility during that reporting period;

- Fourth, that Defendant knew the claim was false, fictitious, and fraudulent; and

- Fifth, that the false, fictitious, and fraudulent information included in the claim was material to the NSA's payment determinations.

## **Penalties**

3.      The maximum penalties provided by statute for the offense(s) to which the Defendant is pleading guilty are as follows:

| Count | Statute | Minimum Prison | Maximum Prison | Supervised Release | Maximum Fine | Special Assessment |
|-------|---------|----------------|----------------|--------------------|--------------|--------------------|
| 1 | 18 U.S.C. § 287 | N/A | 5 years | 3 years | $250,000 | $100 |

a.      Prison: If the Court orders a term of imprisonment, the Bureau of Prisons has sole discretion to designate the institution at which it will be served.

b.      Supervised Release: If the Court orders a term of supervised release, and the Defendant violates the conditions of supervised release, the Court may order the Defendant returned to custody to serve a term of imprisonment as permitted by statute, followed by an additional term of supervised release.

c.      Restitution: The Court may order the Defendant to pay restitution pursuant to 18 U.S.C. §§ 3663, 3663A (note particularly 3663A(c)(1)(B)), and 3664. The amount of the restitution payment owed in this case is currently expected to be $220,379.42, but that mount may be subject to upward or downward adjustment by time of sentencing.

d.      Payment: If a fine or restitution is imposed, it shall be payable immediately, unless the Court orders otherwise under 18 U.S.C. § 3572(d). The Defendant may be required to pay interest if the fine is not paid when due.

e.      Forfeiture:  The Court may enter an order of forfeiture of assets directly traceable to the offense, substitute assets, and/or a money judgment equal to the value of the property subject to forfeiture.

f.      Collection of Debts:  If the Court imposes a fine or restitution, this Office's Financial Litigation Unit will be responsible for collecting the debt.  If the Court establishes a schedule of payments, the Defendant agrees that: (1) the full amount of the fine or restitution is nonetheless due and owing immediately; (2) the schedule of payments is merely a minimum schedule of payments and not the only method, nor a limitation on the methods, available to the United States to enforce the judgment; and (3) the United States may fully employ all powers to collect on the total amount of the debt as provided by law.  Until the debt is paid, the Defendant agrees to disclose all assets in which the Defendant has any interest or over which the Defendant exercises direct or indirect control.  Until the money judgment is satisfied, the Defendant authorizes this Office to obtain a credit report in order to evaluate the Defendant's ability to pay, and to request and review the Defendant's federal and state income tax returns.  The Defendant agrees to complete and sign a copy of IRS Form 8821 (relating to the voluntary disclosure of federal tax return information) and a financial statement in a form provided by this Office.

## **Waiver of Rights**

4.      The Defendant understands that by entering into this Agreement, the Defendant surrenders certain rights as outlined below:

a.      If the Defendant had pled not guilty and persisted in that plea, the Defendant would have had the right to a speedy jury trial with the close assistance of competent counsel.  That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

b.      If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community.  Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily.  All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count.  The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

c.      If the Defendant went to trial, the Government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the Government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever.  If the Defendant wanted to call witnesses in defense, however, the Defendant would have the subpoena power of the Court to compel the witnesses to attend.

d.      The Defendant would have the right to testify in the Defendant's own defense if the Defendant so chose, and the Defendant would have the right to refuse to testify.  If the Defendant chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from the Defendant's decision not to testify.

e.      If the Defendant were found guilty after a trial, the Defendant would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges.  By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

f.      By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence.  By pleading guilty, the Defendant understands that the Defendant may have to answer the Court's questions both about the rights being given up and about the facts of the case.  Any statements that the Defendant makes during such a hearing would not be admissible against the Defendant during a trial except in a criminal proceeding for perjury or false statement.

g.      If the Court accepts the Defendant's plea of guilty, the Defendant will be giving up the right to file and have the Court rule on pretrial motions, and there will be no further trial or proceeding of any kind in the above-referenced criminal case, and the Court will find the Defendant guilty.

h.      By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status, including possible denaturalization.  The Defendant recognizes that if the Defendant is not a citizen of the United States, or is a naturalized citizen, pleading guilty may have consequences with respect to the Defendant's immigration status.  Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States.  Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including the Defendant's attorney or the Court, can predict with certainty the effect of a conviction on immigration status.  The Defendant is not relying on any promise or belief about the immigration consequences of pleading guilty.  The Defendant nevertheless affirms that the Defendant wants to plead guilty regardless of any potential immigration consequences.

## Advisory Sentencing Guidelines Apply

5.      The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. § 3551-3742 (excepting 18 U.S.C. § 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and

must take into account the advisory guidelines range in establishing a reasonable sentence.

## Factual and Advisory Guidelines Stipulation

6.      This Office and the Defendant stipulate and agree to the Statement of Facts set forth in Attachment A, which is incorporated by reference here.

a.      This Office and the Defendant further agree that the applicable base offense level is a ~~seven~~ (7), pursuant to United States Sentencing Guidelines ("U.S.S.G.") § 2B1.1(a)(~~2~~); six (6)

b.      Because the loss in this case to the NSA is no less than $220,379.42, an additional enhancement of **ten (10)** offense levels applies pursuant to U.S.S.G. § 2B1.1(b)(1)(F), thereby producing an adjusted offense level of ~~seventeen~~ **(17)**. sixteen (16)

c.      This Office does not oppose a **two (2)** level reduction ·in the Defendant's adjusted offense level pursuant to U.S.S.G. § 3E1.1(a), based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for the Defendant's criminal conduct. If the terms of that guideline are met, this Office further agrees to make a motion pursuant to U.S.S.G. § 3E1.1(b) for an additional **one (1)** level decrease in recognition of the Defendant's timely notification of the Defendant's intention to enter a plea of guilty. This Office may oppose any adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1(a) and may decline to make a motion pursuant to U.S.S.G. § 3E1.1(b), if the Defendant: (i) fails to admit each and every item in the factual stipulation; (ii) denies involvement in the offense; (iii) gives conflicting statements about the Defendant's involvement in the offense; (iv) is untruthful with the Court, this Office, or the United States Probation Office; (v) obstructs or attempts to obstruct justice prior to sentencing; (vi) engages in any criminal conduct between the date of this Agreement and the date of sentencing; (vii) attempts to withdraw the plea of guilty; or (viii) violates this Agreement in any way.

7.      There is no agreement as to the Defendant's criminal history and the Defendant understands that the Defendant's criminal history could alter the Defendant's offense level.   Specifically, the Defendant understands that the Defendant's criminal history could alter the final offense level if the Defendant is determined to be a career offender or if the instant offense was a part of a pattern of criminal conduct from which the Defendant derived a substantial portion of the Defendant's income.

8.      Other than as set forth above, no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines are in dispute or will be raised in calculating the advisory guidelines range.

## Obligations of the Parties

9.      At the time of sentencing, this Office and the Defendant reserve the right to advocate for a reasonable sentence, period of supervised release, and/or fine considering any appropriate factors under 18 U.S.C. § 3553(a).  This Office and the Defendant reserve the right to bring to the Court's attention all information with respect to the Defendant's background, character, and conduct that this Office or the Defendant deem relevant to sentencing.

## Waiver of Appeal

10.     In exchange for the concessions made by this Office and the Defendant in this Agreement, this Office and the Defendant waive their rights to appeal as follows:

a.      The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or any other statute or constitutional provision, to appeal the Defendant's conviction on any ground whatsoever.  This includes a waiver of all right to appeal the Defendant's conviction on the ground that the statute(s) to which the Defendant is pleading guilty is unconstitutional, or on the ground that the admitted conduct does not fall within the scope of the statute(s), to the extent that such challenges legally can be waived.

b.      The Defendant and this Office knowingly and expressly waive all rights conferred by 18 U.S.C. § 3742 to appeal whatever sentence is imposed (including any term of imprisonment, fine, term of supervised release, or order of restitution) for any reason (including the establishment of the advisory sentencing guidelines range, the determination of the Defendant's criminal history, the weighing of the sentencing factors, and any constitutional challenges to the calculation and imposition of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release), except as follows:

i.      The Defendant reserves the right to appeal any sentence that exceeds the statutory maximum; and

ii.     This Office reserves the right to appeal any sentence below a statutory minimum.

c.      The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

## Forfeiture

11.     The Defendant understands that the Court may enter an Order of Forfeiture as part of the Defendant's sentence, and that the Order of Forfeiture may include assets directly traceable to the offense(s), substitute assets, and/or a money judgment equal to the value of the property derived from, or otherwise involved in, the offenses.

12.     The Defendant agrees to consent to the entry of orders of forfeiture for the property described herein and waives the requirements of Federal Rules of Criminal Procedure 11(b)(1)(J), 32.2, and 43(a) regarding notice of the forfeiture in the charging instrument, advice regarding forfeiture during the change of plea hearing, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment.

13.     The Defendant agrees to assist fully in the forfeiture of the above property. The Defendant agrees to disclose all assets and sources of income, to consent to all requests for access to information related to assets and income, and to take all steps necessary to pass clear title to the forfeited assets to the United States, including executing all documents necessary to transfer such title, assisting in bringing any assets located outside of the United States within the jurisdiction of the United States, and taking whatever steps are necessary to ensure that assets subject to forfeiture are made available for forfeiture.

14.     The Defendant waives all challenges to any forfeiture carried out in accordance with this Agreement on any grounds, including any and all constitutional, legal, equitable, statutory, or administrative grounds brought by any means, including through direct appeal, habeas corpus petition, or civil complaint. The Defendant will not challenge or seek review of any civil or administrative forfeiture of any property subject to forfeiture under this Agreement, and will not assist any third party with any challenge or review or any petition for remission of forfeiture.

## Defendant's Conduct Prior to Sentencing and
## Breach of the Terms of this Agreement

15.     Between now and the date of the sentencing, the Defendant agrees that he will not engage in conduct that constitutes obstruction of justice under U.S.S.G. § 3C1.1; will not violate any federal, state, or local law; will acknowledge guilt to the probation officer and the Court; will be truthful in any statement to the Court, this Office, law enforcement agents, and probation officers; will cooperate in the preparation of the presentence report; and will not move to withdraw from the plea of guilty or from this Agreement.

16.     If the Defendant engages in conduct prior to sentencing that violates the above paragraph of this Agreement, and the Court finds a violation by a preponderance of the evidence, then: (i) this Office will be free from its obligations under this Agreement; (ii) this Office may make sentencing arguments and recommendations different from those set out in this Agreement, even if the Agreement was reached pursuant to Rule

11(c)(1)(C); and (iii) in any criminal or civil proceeding, this Office will be free to use against the Defendant all statements made by the Defendant and any of the information or materials provided by the Defendant, including statements, information, and materials provided pursuant to this Agreement, and statements made during proceedings before the Court pursuant to Rule 11 of the Federal Rules of Criminal Procedure. A determination that this Office is released from its obligations under this Agreement will not permit the Defendant to withdraw the guilty plea. The Defendant acknowledges that the Defendant may not withdraw the Defendant's guilty plea — even if made pursuant to Rule 11(c)(1)(C) — if the Court finds that the Defendant breached the Agreement. In that event, neither the Court nor the Government will be bound by the specific sentence or sentencing range agreed and stipulated to herein pursuant to Rule 11(c)(1)(C).

## **Court Not a Party**

17.     The Court is not a party to this Agreement. The sentence to be imposed is within the sole discretion of the Court. The Court is not bound by the Sentencing Guidelines stipulation in this Agreement. The Court will determine the facts relevant to sentencing. The Court is not required to accept any recommendation or stipulation of the parties. The Court has the power to impose a sentence up to the maximum penalty allowed by law. If the Court makes sentencing findings different from those stipulated in this Agreement, or if the Court imposes any sentence up to the maximum allowed by statute, the Defendant will remain bound to fulfill all of the obligations under this Agreement. Neither the prosecutor, defense counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive. The Defendant agrees that no one has made such a binding prediction or promise.

## **Entire Agreement**

18.     This letter, together with the Sealed Supplement, constitutes the complete plea agreement in this case. This letter, together with the Sealed Supplement, supersedes any prior understandings, promises, or conditions between this Office and the Defendant. There are no other agreements, promises, undertakings, or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement. No changes to this Agreement will be effective unless in writing, signed by all parties and approved by the Court.

If the Defendant fully accepts each and every term and condition of this Agreement, please sign and have the Defendant sign the original and return it to me promptly.

Very Truly Yours,

ROBERT K. HUR
UNITED STATES ATTORNEY

Jefferson M. Gray
Assistant United States Attorney

I have read this Agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

5/20/2019
Date

Kyle Duran Smego

I am the Defendant's attorney. I have carefully reviewed every part of this Agreement, including the Sealed Supplement with the Defendant. The Defendant advises me that the Defendant understands and accepts its terms. To my knowledge, the Defendant's decision to enter into this Agreement is an informed and voluntary one.

5/20/19
Date

Katharine T. Newberger, AFPD

9

## ATTACHMENT A

### STIPULATION OF FACTS

*The undersigned parties stipulate and agree that if this case had proceeded to trial, this Office would have proven the following facts beyond a reasonable doubt. The undersigned parties also stipulate and agree that the following facts do not encompass all of the evidence that would have been presented had this matter proceeded to trial.*

The National Security Agency (NSA) is a component of the United States Department of Defense, which is part of the executive branch of the United States government.  During the period from February 2016 to present, the NSA had ongoing contracts identified as H98230-13-D-0162 (DO 001) (known as the CTS contract) and H98230-17-C-0134 (known as the ROADRALLY contract) with an outside company (Contractor A).  Each of these contracts required Contractor A to supply information technology (IT) services to the NSA, which included providing software engineers and developers to work onsite at various NSA or Contractor A locations.

Contractor A in turn contracted with Subcontractor 1 to provide it with software engineers and developers in order to carry out its performance obligations under the CTS contract, and it likewise contracted with Subcontractor 2 to provide it with software engineers and developers needed to carry out its obligations under the ROADRALLY contract.

From in or about February 2016 through in or about May 2018, defendant Kyle Duran Smego was  successively employed on a full-time basis by Subcontractors 1 and 2 to work on the CTS and ROADRALLY contracts held by Contractor A as a software engineer/front end developer.  Smego's duty stations while he worked on the CTS contract were at various assigned locations known as NBP1, FANX3, and the R&E (Research & Engineering) Building at the NSA's facility at Fort Meade, Maryland, and at

NBP 410, a Contractor A facility. Smego's assigned duty stations with respect to the ROADRALLY contract were initially at the R&E Building and then at OPS1 at the NSA's facility at Fort Meade, Maryland.

Because the subject matter of both of these contracts involved classified information, all of the work performed on these contracts had to be at secure, access-controlled locations. Under the NSA's contract with Contractor A and his contracts with Subcontractors 1 and 2, Smego was therefore required to be physically present at his assigned duty locations to perform his responsibilities on both the CTS and the ROADRALLY contracts.

Subcontractors 1 and 2 each required Smego to submit timesheets in electronic form. Those timesheets required Smego to provide date- and task-specific entries setting forth the number of hours he had worked on the CTS and ROADRALLY contracts and specifying the technical task order (TTO) of the work he had performed or any applicable leave category (e.g., vacation, sick, or holiday). Subcontractors 1 and 2 then submitted Smego's reported hours on a weekly basis to Contractor A and billed Contractor A for the services provided by Smego and other personnel they had hired. Subcontractor 1 billed Contractor A for Smego's services at loaded labor rates ranging from $112.26 to $128.78 an hour, while Subcontractor 2 billed Contractor A for Smego at a loaded labor rate of $159.08 an hour.

Based upon those invoices submitted by Subcontractors 1 and 2, Contractor A then presented monthly invoices to the NSA for the hours that Smego claimed to have worked on the CTS contract and the ROADRALLY contract, typically adding a small mark-up to the labor rate each subcontractor had billed for Smego. NSA paid

Contractor A for Smego's time based upon the labor rates it submitted; Contractor 1 in turn paid Subcontractors 1 and 2 based upon the rates they had submitted for Smego's time; and Subcontractors 1 and 2 in turn paid Smego based upon his agreed hourly rate for the hours he had reported.

Between February 2016 and November 2017, Smego reported to Subcontractor 1 that he had worked 3,289 hours on the CTS contract. Between November 2017 and May 2018, Smego reported to Subcontractor 2 that he had worked 797.5 hours on the ROADRALLY contract.

A subsequent review by the NSA of access control (key card) and timecard information demonstrated that Smego was not actually present at his assigned duty stations for at least 1,326 of the 3,289 hours he had reported to Subcontractor 1 (40.3%) on the CTS contract and 375 of the 797.5 hours he had reported to Subcontractor 2 (47%) on the ROADRALLY contract. In addition, during the period between April 2016 and October 2016 when Smego was assigned to work at a contractor location known as NBP410, the card access reader at that location only reported the times that Smego entered the secured facility, but not the times he left it. On most of the days when Smego worked at this location, the entry records reflect that Smego made entrances into the secured facility anywhere from four or five to as many as seven or eight times in the morning and the first part of the afternoon, but there are no records of further entrances after 2 or 3 p.m. Based upon his frequent early departures from his other work locations – as well as occasional emails he sent while working at NBP410 (such as one sent on June 27, 2016 at 12:13 p.m. saying "I'm outta here shortly," on a day when there is no record of him accessing the facility after 11:48 a.m.) – there are believed to be a

12

substantial number of additional hours for which Smego improperly billed while assigned to NBP410 between April and October 2016, but the number of these hours and the resulting fraudulent payments cannot be calculated with certainty.

All of the hours that were falsely reported by Smego were subsequently billed by the subcontractors to Contractor A, and were in turn billed by Contractor A to the NSA. In addition to days on which Smego overstated the number of hours he had worked, the timesheets that Smego submitted to Subcontractors 1 and 2 included entries for 119 separate days in which Smego represented that he had worked an average of 8 hours (94 days for Subcontractor A and 25 days for Subcontractor B) when, in fact, he had not accessed his assigned work locations and had not worked at all on those days.

Based upon the false and fictitious billing records submitted by Smego to Subcontractors 1 and 2, which they in turn submitted to Contractor A and which it then submitted to the NSA, the NSA in turn overpaid Contractor A by $160,724.42 for fictitious hours reported by Smego on the CTS contract and $59,655 for fictitious hours that he reported on the ROADRALLY contract, for a total combined overpayment of $220,379.42. Subcontractors 1 and 2 then respectively paid Smego $85,275 and $29,835 for work he had not actually performed on these contracts – a total of $115,110.

SO STIPULATED:

_____
Defendant Kyle Smego

_____
Jefferson M. Gray
Assistant United States Attorney

_____
Defense Counsel

13